**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| STARK COUNTY, NAT PRATHER, CHRISTOPHER HYLTON, CONSUELLA GREEN, MEGAN MAYLE, DONALD FISHER, and JANUARY FISHER, | |
| Plaintiffs, | Case No. 5:11-cv-1322 |
| v. | |
| JOHN L. RUTH, MARY RUTH, YORKSHIRE APARTMENTS, LLC, and WALES RIDGE, LLC, | |
| Defendants. | **JURY DEMAND** |

## COMPLAINT

1.      Plaintiffs Stark County, Nat Prather, Christopher Hylton, Consuella Green, Megan Mayle, and Donald and January Fisher bring this action against Defendants John and Mary Ruth, Yorkshire Apartments, LLC, and Wales Ridge, LLC (collectively "Defendants"), seeking declaratory and injunctive relief and damages to redress Defendants' unlawful housing discrimination based on race and familial status in violation of the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, and Ohio Rev. Code § 4112.02(H).

2.      Defendants own and manage several apartment complexes, consisting of at least eight buildings in Jackson Township, including "Wales Ridge," "Yorkshire Apartments," and "Thackeray Ledges."

3.      In March 2008, Christopher Hylton was hired as manager for the Wales Ridge and Yorkshire Apartment buildings.  He met with Defendant John Ruth who explained the

policies and practices for managing the properties. Mr. Ruth instructed Mr. Hylton that he did not want African-American tenants, who he referred to as "niggers" and "porch monkeys." Mr. Ruth asserted that having African-American tenants would lower the value of the properties and create theft problems. Mr. Ruth told Mr. Hylton that when dealing with prospective tenants over the phone, he should listen to the caller's manner of speaking and determine whether the tenants were "niggers." Mr. Ruth instructed Mr. Hylton to "blow off" African-American prospective tenants. Mr. Ruth said that being unresponsive in this way would keep African Americans out of the complexes and keep him from getting caught violating the law.

4. Defendants instructed the managers of their properties to ensure that no property contained more than one-third African-American tenants and that if the one-third limit was reached, African-American prospective tenants should be told that no apartments were available. Managers were also instructed that families with children were undesirable tenants and should be restricted to basement or first floor units. When managers refused to comply with Defendants' illegal housing practices, they were fired.

5. Defendants harassed Plaintiff Nat Prather, a seventy-one-year-old African-American retired chemistry teacher and bus driver, with false noise violations for years and then used those fictitious complaints to manufacture a means to force him to leave. Similarly, Donald and January Fisher, a married couple with two minor children, were given an ultimatum to either move with their kids to a basement unit or move out of the complex entirely.

6. Consuella Green, an African-American mother of a four-year-old, was approved to rent an apartment by managers willing to defy Defendants' orders to discriminate. Defendants fired those managers, forced Ms. Green to reapply, evaded her inquiries, and then denied her application.

2

7.     Megan Mayle, a full-time student at Kent State University, was ordered to fill out forms to enable Defendants to check the credit history and criminal background of her African-American friends who would occasionally visit her at her apartment. When Ms. Mayle refused, she was warned by Defendants' office manager that she was putting herself in danger by associating with such individuals and threatened with a rent increase.

8.     Through these and other acts alleged more fully herein, Defendants have violated the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq*., and Ohio Rev. Code § 4112.02(H). Plaintiffs bring this Complaint to redress the injuries suffered as a result of Defendants' continuing pattern of discrimination and fair housing violations.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(4), and 28 U.S.C. § 1367.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to the claims occurred in this District and because at all relevant times Defendants Yorkshire Apartments, LLC and Wales Ridge, LLC were incorporated in Ohio and doing business in the District.

## PARTIES

11.     Plaintiff Stark County is a municipal corporation organized and existing under the laws of Ohio as a county of Ohio. The Stark County Fair Housing Department is a department of the Stark County Regional Planning Commission and administers its fair housing program on behalf of the Board of Stark County Commissioners. The Department's mission is to eliminate fair housing discrimination and enforce federal and state fair housing laws. Stark County's Fair Housing Department is empowered to promote and advance this mission in cities and townships

3

throughout Stark County, including Jackson Township, where the properties at issue are located and the challenged discrimination occurred.  Stark County and its Fair Housing Department are collectively referred to herein as "Stark County."

12.     Plaintiff Nat Prather is a seventy-one-year-old African-American retired school teacher and a resident of Stark County, Ohio.  Mr. Prather rented an apartment from Defendants located at 3626 Wales Avenue in Massillon, Ohio from November 2005 until Defendants issued him a notice to vacate in 2008.

13.     Plaintiff Christopher Hylton is an Ohio resident who managed several of Defendants' properties in 2008, including the properties located at 3544 Wales Road, 3588 Wales Avenue, and 3616 Wales Avenue in Jackson Township, Ohio.  During his tenure as manager, Mr. Hylton lived on-site and rented an apartment from Defendants.  Mr. Hylton was terminated as property manager and forced to leave his unit after he refused to comply with Defendants' discriminatory housing restrictions.

14.     Plaintiff Consuella Green is an African-American mother of a four-year-old child who attempted to rent an apartment from Defendants in the summer of 2008.  After receiving approval of her rental application from Defendants' apartment managers, Defendants forced Ms. Green to reapply for an apartment and then denied her application.

15.     Plaintiff Megan Mayle, a full-time student at Kent State University's Stark County campus, rented an apartment from Defendants beginning in May 2008.  Ms. Mayle was subjected to unlawful treatment and discrimination because of her association with African-Americans.

16.     Plaintiffs Donald and January Fisher are a married couple with two minor children.  The Fishers were tenants of Defendants until March 2009, when Defendants required

4

them to either move their children to a basement unit or move out of Defendants' apartment complex.

17.     Defendant John Ruth is a resident of Stark County, Ohio who at all relevant times owned, leased, and/or operated the subject properties.  The subject properties include the properties located at the following addresses in Jackson Township, Massillon, Ohio: 3544 Wales Avenue NW, 3550 Wales Avenue NW, 3588 Wales Avenue NW, 3598 Wales Avenue NW, 3616 Wales Avenue NW, 3626 Wales Avenue NW, 2830 Thackeray Avenue NW, and 2880 Thackeray Avenue NW (collectively "Subject Properties").  Mr. Ruth is responsible individually and in his roles as owner of the Subject Properties and owner, employee, and/or agent of the other Defendants and Penson Properties, for unlawful housing practices alleged herein.

18.     Mr. Ruth operates and/or manages real estate rentals under the name "Penson Properties."  Penson Properties is a fictitious name Mr. Ruth has registered with the Ohio Secretary of State.

19.     At all times relevant to this action, Mr. Ruth is an owner, employee, and/or agent for Defendants Yorkshire Apartments, LLC and Wales Ridge, LLC and/or otherwise works on behalf of Defendants Yorkshire Apartments, LLC and Wales Ridge, LLC.  At times relevant to the allegations herein, Defendant John Ruth acted in the scope of his role as an owner, employee, and/or agent for Defendants Yorkshire Apartments, LLC and Wales Ridge, LLC.

20.     Defendant Mary Ruth is a Stark County resident who owns, leases, and/or operates some or all of the Subject Properties.  At times relevant to the allegations herein, Defendant Mary Ruth acted in the scope of her role as an owner of Subject Properties.  Mrs. Ruth is responsible individually and in her role as owner of the Subject Properties for the unlawful housing practices alleged herein.

5

21.     Defendant Yorkshire Apartments, LLC ("Yorkshire") is a limited liability company organized under the laws of Ohio, with its principal place of business in Ohio. Defendant Yorkshire owns, leases, and/or operates some of the Subject Properties.

22.     Defendant Wales Ridge, LLC ("Wales Ridge") is a limited liability company organized under the laws of Ohio, with its principal place of business in Ohio.  Defendant Wales Ridge owns, leases, and/or operates some of the Subject Properties.

## FACTUAL BACKGROUND

23.     Defendants own, lease, and/or operate at least three apartment complexes, which contain a total of eight buildings, in Jackson Township.  The "Wales Ridge" complex contains four buildings, located at 3544, 3550, 3588, and 3598 Wales Ridge Avenue NW.  The "Yorkshire Apartments" complex is comprised of two buildings located at 3616 and 3626 Wales Ridge Avenue NW.  The "Thackeray Ledges "complex is made up of two buildings located at 2830 and 2880 Thackeray Avenue NW.

24.     Defendants employ managers to assist in the operation of their apartment buildings.  The managers' responsibilities include showing apartments to prospective tenants, reviewing and evaluating rental applications, and issuing leases to approved tenants.  Defendants instruct their managers regarding the policies, practices, and procedures managers are required to follow in responding to inquiries from prospective tenants, determining whether to approve an application, and deciding which units to rent to particular tenants.

25.     Defendants have employed several managers at its various complexes.  In 2008, Defendants employed one manager for the Wales Ridge and Yorkshire Apartments complexes, and a different set of managers for the Thackeray Ledges complex.

6

I.      **Defendants' Discriminatory Policies and Practices**

26.     Defendants sought to exclude or limit the number of African Americans and families with children in their complexes.

27.     Defendants instructed managers to ensure that no property contained African-American tenants in more than one-third of its units.  If this one-third limit on African-American tenants was reached, Defendants required managers to instruct African-American prospective tenants that no apartments were available even when vacancies existed.  Mr. Ruth told managers to lie to prospective tenants by telling tenants that they would be called once an apartment became available but not to inform them of vacancies.  Defendants believed that African-American tenants were undesirable and decreased the value of the complexes.

28.     Mr. Ruth also instructed managers that families with children were not desirable tenants and should be restricted to basement or first floor units, rather than being permitted to rent whichever vacant unit they preferred.

29.     In addition to denying equal rental opportunities to prospective tenants based on race and familial status, Defendants also subjected existing tenants to discriminatory treatment. Defendants, with the assistance of their employees, agents, and managers, discriminated against African-American tenants and families with children in an effort to induce them to move out of Defendants' properties or to manufacture grounds to evict them.

30.     Defendants fabricated noise complaints against African-Americans and families with children and instructed managers to issue false noise violations to African-Americans and families with children.

31.     Defendants' discriminatory acts against African-Americans, families with children, and people associated with members of these protected classes have been taken

7

pursuant to an ongoing and continuous unlawful practice that violates federal and state fair housing laws.

## II.     Plaintiff Christopher Hylton

32.     Christopher Hylton learned of Penson Properties in 2008 through an advertisement he saw for an available position.  Mr. Hylton was hired as manager for the Wales Ridge and Yorkshire Apartments complexes in March 2008.

33.     Prior to starting in his position as manager, Mr. Hylton met with Defendant John Ruth.  Mr. Ruth explained the policies and practices Mr. Hylton was to follow when renting units to, and dealing with, prospective and current tenants.

34.     Mr. Ruth instructed Mr. Hylton that he did not want African-American tenants. In speaking with Mr. Hylton, Mr. Ruth referred to African-Americans as "niggers" and "porch monkeys."  Mr. Ruth asserted that having African-American tenants would diminish the value of the properties and invite theft problems.

35.     Mr. Ruth advised Mr. Hylton that when dealing with prospective tenants over the phone, Mr. Hylton should listen to the callers' manner of speaking to determine whether they were "niggers."  Mr. Ruth then instructed Mr. Hylton to simply "blow off" African-American prospective tenants by not returning calls regarding available units.  Mr. Ruth explained that being unresponsive would effectuate his goal of excluding African Americans while reducing the likelihood that he would get caught violating the law.

36.     During his tenure as manager, Mr. Hylton was often instructed by Mr. Ruth and/or other employees or agents of Defendants to issue false noise violations to African-Americans tenants and tenants with children.

8

37.     When Mr. Hylton protested that the noise complaints were unfounded and that he could not hear any noise coming from a tenant's apartment, Mr. Ruth would insist that he still knock on the door and deliver the noise complaint.

38.     Mr. Hylton objected to the issuance of false noise violations to African Americans and families with children simply because Defendants considered them as "undesirables."  Mr. Hylton objected to Defendants' discriminatory rental policies and practices regarding African Americans and families with children.  Mr. Hylton rented units to qualified tenants regardless of their race or familial status.  When Mr. Hylton departed from Defendants' discriminatory rules, he was scolded by Mr. Ruth and/or his employees and agents.

39.     Unable to secure Mr. Hylton's compliance with Defendants' discriminatory policies, Mr. Ruth terminated Mr. Hylton as manager in July 2008.  Mr. Hylton's termination came after he had once again violated Mr. Ruth's discriminatory rental policies designed to exclude African-Americans and families with children.

40.     Mr. Hylton was fired because he refused to comply with Defendants' discriminatory housing practices and refused to deprive prospective tenants of their fair housing rights on the basis of race or familial status.  By firing Mr. Hylton, Defendants prevented Mr. Hylton from affording tenants the opportunity to enjoy their fair housing rights.

41.     Immediately following his termination, Mr. Ruth raised Mr. Hylton's rent and ordered Mr. Hylton to pay the increased rent or move out.  Mr. Hylton was forced to move out.

**III.    Plaintiff Nat Prather**

42.     Plaintiff Nat Prather moved into the Yorkshire Apartments complex in November 2005.  He was one of only a few African-American tenants in the entire complex.  Soon after

9

moving in, Mr. Prather began being harassed by Defendants' managers and agents with false noise complaints.

43.     Mr. Prather is a quiet man who cannot stand loud noise.  He had never before been accused of being loud.  Being retired, Mr. Prather spent much of his time away from his apartment, frequently traveling to Columbus and Cleveland to visit friends and family.  On the occasions when Mr. Prather was actually in his apartment, he did not have any parties or play music or the television at a high volume.

44.     Despite his quiet existence, Mr. Prather was repeatedly subjected to false accusations of excessive noise during his tenancy.

45.     Early in his tenancy, a manager came to Mr. Prather's door and accused him of making excessive noise when Mr. Prather was chatting with his daughter while listening to the Yanni CD she had given him for Christmas.  Mr. Prather knew that the accusation was false because the Yanni CD was playing softly enough to allow him and his daughter to carry on a conversation.  Despite their falsity, the accusations continued.

46.     Another time one of Defendants' managers issued Mr. Prather a spurious noise complaint when he was simply having a conversation with a friend.  Mr. Prather had recently bought a new computer and had invited a friend over to assist him in setting it up.  Mr. Prather was quietly talking to his friend about the computer when he was interrupted by another false accusation of excessive noise.

47.     The excessive noise violations issued to Mr. Prather were false and discriminatory.

48.     Defendants' harassing noise complaints continued unabated throughout Mr. Prather's tenancy.  Defendants' discriminatory and harassing conduct culminated in Defendants'

10

issuing a notice to vacate to Mr. Prather in August 2008.  Defendants demanded that Mr. Prather move out of his apartment before the end of the month or be evicted.  The only justification provided in the notice to vacate was the false noise violations Defendants had issued to him.

49.     Defendants used the fictitious noise violations issued to Mr. Prather to manufacture an excuse to evict him.  Defendants succeeded in forcing Mr. Prather to move.  He vacated the property toward the end of August 2008.  As a result of Defendants' unlawful conduct, Mr. Prather was forced to move to a more expensive, less convenient apartment elsewhere.

## IV.  Plaintiff Megan Mayle

50.     In May 2008, Plaintiff Megan Mayle, who is white, moved into an apartment in the Thackeray Ledges complex.  Ms. Mayle moved to the area to attend Kent State University at their Stark County campus.  Ms. Mayle was a full-time student.  As she indicated in her rental application, Ms. Mayle's income was based on student loans, which she used to pay rent.  Ms. Mayle's rental application was approved and she moved into Defendants' property.

51.     Ms. Mayle occasionally invited several African-American friends over to her apartment to spend time together, chat, and work on their studies.  None of Ms. Mayle's friends lived with her or at a building managed by Penson Properties.

52.     In August 2008, Defendants sent Ms. Mayle a letter requiring her friends to submit a rental application form that sought information regarding her friends' credit history, employment, and criminal records.

53.     Defendants required Ms. Mayle to submit this information about her guests because they were African-American.  Ms. Mayle was aware of white tenants who had white

11

family members or friends actually move in with them, but who were not required to complete rental applications.

54.     Ms. Mayle refused to provide Defendants with information on her friends or subject her friends to such background checks.  Instead, Ms. Mayle called Defendants' office manager.  She reminded the manager that she was the sole occupant of the apartment and indicated that she would not submit rental application forms or otherwise give Defendants information that would allow them to run background checks on her friends.

55.     Defendants' office manager was angered by Ms. Mayle's response and indicated that Ms. Mayle was putting herself in danger by associating with her African-American friends. The manager stated that she would notify the Defendants that Ms. Mayle had refused to submit the application forms.

56.     In June 2009, Ms. Mayle moved out of Penson Properties.

**V.    Plaintiff Consuella Green**

57.     Consuella Green is African-American, attended Kent State with Ms. Mayle, and was one of Ms. Mayle's close friends.  Ms. Green had been taking classes at the University's Kent campus and was relocating to attend classes at Kent State's Stark County campus.

58.     Hoping to live close to Ms. Mayle, Ms. Green applied for an apartment in Defendants' Thackeray Ledges complex for her and her then-one-year-old son in early July 2008.  Ms. Green completed all of the necessary paperwork and submitted her rental application to the managers of Thackeray Ledges, the same managers who had approved Ms. Mayle's application.  Like Ms. Mayle, Ms. Green indicated in her application that she was a student at Kent State and would be relying on student loans to pay her rent.  Ms. Green also indicated that she had additional employment income.  In addition to attending Kent State, Ms. Green held a

12

service manager position at a local restaurant.  Ms. Green also received relocation funding from Stark County.  Ms. Green indicated that she wanted to pay six months' rent up front.

59.     The managers of Thackeray Ledges reviewed Ms. Green's application, conducted all necessary background and credit checks, and approved Ms. Green as a tenant.  Shortly thereafter, Ms. Green learned that the managers at Thackeray Ledges had been fired.

60.     Ms. Green called Defendants' office manager to confirm her move-in date and other details.  Defendants' office manager claimed that she did not have Ms. Green's application and required Ms. Green to complete another application.

61.     Ms. Green went to Defendants' office and completed another application that same day.  She submitted her application in person to Defendants' office manager.  In applying, Ms. Green once again explained that she had student loan income, employment income, and County relocation funds, and that she intended to pay six months' rent up front.

62.     Defendants' office manager told Ms. Green that she would contact Ms. Green about her application within one week.  Having not heard from Defendants after a week, Ms. Green contacted Defendants' office, but she was given the run-around for days.  When Ms. Green finally reached Defendants' office manager, she was told to stop calling and wait for a return call in another four days.

63.     After waiting another four days, Ms. Green was told that Defendants were denying her rental application.  The only explanation Defendants gave for denying Ms. Green's second application was that she supposedly had not been employed by the restaurant long enough.  Ms. Green had worked for the same restaurant for several years.

64.     Ms. Green was denied the opportunity to rent an apartment from Defendants because she is African-American and has a child.

65.     Ms. Green was forced to rent an apartment elsewhere at a significantly higher price.

**VI.     Plaintiffs Donald and January Fisher**

66.     Donald and January Fisher had lived in the Yorkshire Apartments for several years when their stepdaughter came to live with them and their four-year old child in the fall of 2008.

67.     Shortly thereafter, Defendants' managers instructed the Fishers and other tenants to keep their kids inside and make sure all children's toys or games were out of sight so that they would not be seen by potential renters.  Defendants' agents, including Yorkshire Apartments manager David Robinson, began harassing the Fishers with false accusations of excessive noise. The Fishers protested that the allegations were unfounded, but the accusations continued.

68.     The Fishers observed that a tenant without children who lived in a nearby unit frequently threw loud parties, but was not issued noise violations.

69.     In February 2009, Defendants' manager, Mr. Robinson, came to the Fishers' door and suggested that the Fishers relocate to a basement unit in another building.  The Fishers told Mr. Robinson that they did not want to move.

70.     In March 2009, Mr. Robinson again asked the Fishers to move to a basement apartment in another building.  This time, however, Mr. Robinson ordered them to either move to the lower-level unit or move out.

71.     Because of the discriminatory treatment they received, the Fishers decided to move from the Yorkshire Apartments.  Upon hearing that the Fishers were moving out, Defendant John Ruth called Mr. Fisher and explained that children were not suited to live in upper-floor apartments, but should instead be relegated to basement units.

14

72.    The Fishers moved out of Yorkshire Apartments toward the end of March 2009. The Fishers were forced to relocate to a different apartment that is less conveniently located and significantly more expensive.

**VII.   Stark County's Efforts to Address Defendants' Unlawful Conduct**

73.    Stark County learned of Defendants' unlawful conduct through complaints it received from Stark County residents.  In response, Stark County initiated an investigation of Defendants' housing practices to determine the scope of the unlawful conduct and the extent of the harm it had caused and was causing.  Stark County sought to identify and counteract Defendants' discriminatory actions, which were inflicting harm on the County and its fair housing mission.

74.    Stark County expended significant time and resources investigating Defendants' housing practices.  Stark County interviewed witnesses, conducted site visits, spoke with former tenants and managers, gathered information from complainants, and researched Defendants.

75.    After investigating Defendants' unlawful practices and the injuries they caused, Stark County filed a complaint with the Ohio Civil Rights Commission on September 28, 2009 seeking to further address Defendants' illegal conduct.  Mr. Prather filed a complaint with the Ohio Civil Rights Commission regarding Defendants' discriminatory conduct on August 30, 2009; Mr. Hylton filed a complaint with the Ohio Civil Rights Commission regarding Defendants' discriminatory conduct on September 1, 2009; Ms. Mayle and Ms. Green filed complaints with the Ohio Civil Rights Commission regarding Defendants' discriminatory conduct on August 25, 2009; and the Fishers filed a complaint with the Ohio Civil Rights Commission regarding Defendants' discriminatory conduct on September 28, 2009.  Ms. Mayle and Ms. Green's complaints were dismissed in October 2009.  The administrative complaints

15

filed by Mr. Prather, Mr. Hylton, the Fishers, and Stark County have been pending and continue
to be pending since they were filed.

76.    In the summer of 2010, the Commission concluded its investigation and issued
decisions finding probable cause that Defendants engaged in unlawful housing practices that
injured Mr. Prather, Mr. Hylton, the Fishers, and Stark County.

77.    After Defendants sought reconsideration of that finding, the Commission affirmed
its ruling in September 2010 and once again held that there was probable cause that Defendants
engaged in unlawful housing practices.

78.    On June 1, 2011, the Ohio Civil Rights Commission filed a complaint in Ohio
Common Pleas court on behalf of Stark County, Christopher Hylton, Nat Prather, Donald and
January Fisher, and Norman and Kendra Druckenbrod.

## INJURIES TO PLAINTIFFS

79.    As a result of each Defendant's unlawful actions as described above, the
individual Plaintiffs have suffered, continue to suffer, and will in the future suffer irreparable
loss and injury, including but not limited to fear, humiliation, embarrassment, emotional distress,
and unlawful deprivation of their federally protected rights to exercise and enjoy equal housing
opportunities without regard to race, color and/or familial status.  Defendants have continued to
subject the individual Plaintiffs to false accusations even after they vacated Defendants'
properties.

80.    As a result of each Defendant's unlawful actions as described above, the
individual Plaintiffs have suffered, continue to suffer, and will in the future suffer continuing
economic damages, including but not limited to out-of-pocket and other expenses incurred as a

result of, among other things, Defendants' efforts to deny Plaintiffs equal housing opportunities and force Plaintiffs to find housing elsewhere at greater cost.

81.     Defendants are liable for violations of Plaintiffs' rights under the Fair Housing Act and state law because at all times relevant hereto Defendants' managers, employees, and agents were acting (a) with the consent of, (b) under the control and supervision of, and/or (c) within their authority as agents of Defendants.

82.     Defendants' unlawful actions have frustrated Stark County's mission of promoting fair housing and non-discrimination in housing throughout Stark County.  Stark County has made substantial efforts and expended considerable resources to ensure equal housing opportunities without regard to race, color, and/or familial status in its service area. Defendants' discriminatory practices have and continue to impede Stark County's efforts to ensure equal housing opportunities without regard to race, color, and/or familial status and thereby frustrate its mission.

83.     Defendants' unlawful actions have forced Stark County to divert its resources from its typical activities, which include a range of educational, testing, investigative, counseling, and referral services in Stark County.

84.     Instead of engaging in these usual activities, Stark County has been forced to identify and counteract Defendants' unlawful housing practices by, among other activities: investigating Defendants' discrimination; conducting site visits; interviewing witnesses; gathering facts; working with complainants; and reaching out to community members to identify and counsel others whose fair housing rights may be threatened.

85.     Stark County has devoted time, resources, and money toward efforts to offset the effect of Defendants' unlawful practices and actions.

17

86.     Plaintiffs' injuries were caused by Defendants' discriminatory acts taken pursuant to Defendants' ongoing and continuous unlawful policy and practice that stands in violation of federal and state fair housing laws.

87.     Each Defendant's unlawful actions as described above were, and are, intentional and willful, and/or have been and are being implemented with callous and reckless disregard for Plaintiffs' statutorily protected rights.

88.     Unless enjoined, Defendants will continue to engage in unlawful acts and maintain their discriminatory policies and practices.  Plaintiffs have no adequate remedy at law. Plaintiffs are now suffering and will continue to suffer irreparable injury from Defendants' unlawful conduct, policies, and practices unless relief is provided by this Court.

## CLAIMS FOR RELIEF

### Count I

### Violation of 42 U.S.C. §§ 3604, 3617

89.     Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 88 above.

90.     Through Defendants' acts as described above, including the acts of their employees and/or agents, Defendants violated 42 U.S.C. § 3604(a), which makes it unlawful to refuse to rent a dwelling or otherwise make a dwelling unavailable to any person because of race, color, or familial status.

91.     Through Defendants' acts as described above, including the acts of their employees and/or agents, Defendants violated 42 U.S.C. § 3604(b), which makes it unlawful to discriminate against any person in the terms, conditions, or privileges of the rental of a dwelling,

or in the provision of services and facilities in connection therewith, because of race, color, or familial status.

92.     Through Defendants' acts as described above, including the acts of their employees and/or agents, Defendants have violated 42 U.S.C. § 3604(c), which makes it, *inter alia*, unlawful to make or cause to be made any statement relating to the rental of a dwelling that indicates any preference or limitation based on race, color, or familial status.

93.     Through Defendants' acts as described above, including the acts of their employees and/or agents, Defendants have violated 42 U.S.C. § 3604(d), which makes it unlawful to represent to any person because of race, color or familial status that any dwelling is not available for inspection or rental when such a dwelling is, in fact, so available.

94.     Through Defendants' acts as described above, including the acts of their employees and/or agents, Defendants have violated 42 U.S.C. § 3617, which makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of their Fair Housing Act rights, or on account of having exercised or enjoyed, or aided or encouraged others in exercising or enjoying any right secured by the Fair Housing Act.

95.     Defendants' acts and conduct in violation of the Fair Housing Act caused each Plaintiff injury.

### Count II

### Violation of Ohio Revised Code § 4112.02(H)

96.     Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 95 above.

97.     Through Defendants' acts as described above, including the acts of their employees and/or agents, Defendants violated Ohio Revised Code § 4112.02(H)(1) which makes

19

it unlawful to refuse to rent or lease housing accommodations, refuse to negotiate for the rental or lease of housing accommodations, or otherwise deny or make unavailable housing accommodations because of race, color, or familial status.

98.     Through Defendants' acts as described above, including the acts of their employees and/or agents, Defendants violated Ohio Revised Code § 4112.02(H)(2), which makes it unlawful to represent to any person that a housing accommodation is not available for inspection, rental, or lease when in fact the housing accommodation is available, because of race, color, or familial status.

99.     Through Defendants' acts as described above, including the acts of their employees and/or agents, Defendants violated Ohio Revised Code § 4112.02(H)(4), which makes it unlawful to discriminate against any person in the terms or conditions of renting or leasing any housing accommodation, or in furnishing facilities, services, or privileges in connection with the occupancy of any housing accommodation because of race, color, or familial status.

100.     Through Defendants' acts as described above, including the acts of their employees and/or agents, Defendants have violated Ohio Revised Code § 4112.02(H)(7), which makes it unlawful to make any statement relating to the rental or lease of any housing accommodation that indicates any preference, limitation, specification, or discrimination based on race, color, or familial status, or an intention to make any such preference, limitation, specification, or discrimination.

101.     Through Defendants' acts as described above, including the acts of their employees and/or agents, Defendants have violated Ohio Revised Code § 4112.02(H)(12), which makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or

20

enjoyment of, or on account of that person's having exercised or enjoyed or having aided or encouraged any other person in the exercise or enjoyment of any right granted by Ohio Revised Code § 4112.02(H).

102.     Defendants' acts and conduct in violation of the Ohio Revised Code § 4112.02(H) caused each Plaintiff injury.

## PRAYER FOR RELIEF

103.     WHEREFORE, Plaintiffs pray that this Court grant them the following relief:

(1)     Enter a declaratory judgment finding that the foregoing actions of Defendants violate the Fair Housing Act, 42 U.S.C. §§ 3604(a)-(d) and 3617, and Ohio Revised Code § 4112.02(H);

(2)     Enter an injunction directing Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

(3)     Award compensatory damages to Plaintiffs in an amount to be determined by the jury that would fully compensate Plaintiffs for the economic loss, humiliation, embarrassment and emotional distress that they have suffered and continue to suffer as a result of the discriminatory and retaliatory conduct alleged herein;

(4)     Award punitive damages to Plaintiffs in an amount to be determined by the jury that would punish Defendants for the willful, wanton and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

21

(5)     Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42

U.S.C. §§ 3613(c)(2) and 1988; and

(6)     Order such other relief as this Court deems just and equitable.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs request trial by jury as to all issues in this case.

Dated:  June 28, 2011                          Respectfully submitted,


 /s/ Stephen M. Dane
Reed N. Colfax (*pro hac vice motion to be filed*)
Megan Moran-Gates (*pro hac vice motion to be filed*)
Relman, Dane & Colfax PLLC
1225 19th Street, NW, Suite 600
Washington, D.C. 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
rcolfax@relmanlaw.com
mmgates@relmanlaw.com

Stephen M. Dane (0013057)
312 Louisiana Avenue
Perrysburg, Ohio 43551
(419) 873-1814
sdane@relmanlaw.com

22