UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| United States of America, et al.,           ) | CASE NO. 5:11CV1322 |
|                                             ) | Member Case No:  5:11CV2350 |
|           Plaintiff,                        ) | |
|                                             ) | JUDGE JOHN R. ADAMS |
|   vs.                                       ) | |
|                                             ) | **MEMORANDUM OF OPINION** |
|                                             ) | **AND ORDER** |
| John L. Ruth, et al.,                       ) | |
|                                             ) | |
|           Defendants.                       ) | |
|                                             ) | |

Pending before the Court are ten individual motions for summary judgment filed by the various Defendants in this matter.  The Court will now examine each of those motions.

**I.  FACTS**

Before outlining the basic factual background of this matter, the Court must detail the individuals involved in the matter in general.  The primary Defendants in the matter are John and Mary Ruth.  Together and through multiple legal entities, the Ruths own and operate numerous apartment complexes.  The record indicates that John Ruth has been involved in the property rental business for nearly four decades.  The primary Plaintiff in the matter is the United States Government, alleging that the Ruths engaged in a pattern and practice of discriminating against African Americans and families with children.  The Plaintiffs, however, also include Stark County, Nat Prather, Christopher Hylton, Consuela Green, Megan Mayle, Donald & January Fisher, and the Ohio Civil Rights Commission.  In the hopes of providing some guidance, the Court would note the following about those involved in this action:

| Person or Entity | Brief Description |
|---|---|
| Thackeray Ledges Apartments | 24-unit complex owned by John and Mary Ruth from 2008 to 2012 |
| Wales Ridge Apartments | 64-unit complex owned by John and Mary Ruth from 1999 to April of 2006. April of 2006, ownership was transferred to Wales Ridge, LLC |
| Wales Ridge, LLC | members |
| Yorkshire Apartments | April of 2006, ownership was transferred to Yorkshire Apartments, LLC |
| Yorkshire Apartments, LLC | Owns Yorkshire Apartments, John and Mary Ruth are sole members |
| Penson Properties | Fictitious name utilized by John Ruth to manage all three complexes |
| Randy Foster | Lived in Wales Ridge from 2007 to 2010 |
| Larry Jackson | Lived in Yorkshire from 2004 to 2007 with Christine White |
| Christine White | Lived in Yorkshire from 2004 to 2007 with Larry Jackson |
| Robert Walters | Lived in Yorkshire from 1993 to 2001 |
| Bobbi Stewart | Lived in Wales Ridge from 2005 to 2009 |
| Roberta Boynton | Lived in Wales Ridge May to November of 2005 |
| Nicole and Christopher Miller | Lived in Thackeray Ledges from 2008 to 2011 |
| Stephanie Hilliard | Lived in Wales Ridge from October 2001 to February 2002 |
| Dona Mitchell | Worked as bookkeeper for Ruths from October 2000 to March 2001 |
| Joniece George | Assisted in managing Wales Ridge and Yorkshire from September 2000 to 2001 or 2002 |
| Gregory Mays | Assisted in managing Wales Ridge and Yorkshire from September 2000 to 2001 or 2002 |
| Gene & Nancy Schneff | Mr. Schneff began as maintenance in 2001. Managed Yorkshire and Wales Ridge by 2002 and hired Mrs. Schneff to assist in 2004 |
| Tina & Edward Hoover | Hired in March of 2006 to work at Yorkshire and Wales Ridge |
| John Morrison | Managed Yorkshire and Wales Ridge in 2007 |
| Christopher Hylton | Managed Yorkshire and Wales Ridge from March to July of 2008 |
| Kendra & Norman Druckenbrod | Managed and maintained Thackeray Ledges from March to July of 2008 |
| Veronica Robinson | Performed housekeeping work at Thackeray Ledges in 2010 and 2011 |
| Donald and January Fisher | Lived in Yorkshire in 2008 |
| Nat Prather | Lived in Yorkshire from 2005 to 2008 |
| Consuela Green | Applied to rent from Thackeray Ledges in 2008 |
| Megan Mayle | Lived in Thackeray Ledges in 2008, allowed Green to stay at her residence on occasion |

The above is not intended to be an exhaustive description of each person or entity, but has been provided as a reference point for the Court's later discussions.

At its core, this matter presents in a straightforward manner despite its complexity. The Government contends that it has the testimony of no less than ten former employees, all of whom assert that they were instructed by Mr. Ruth or his staff to discriminate against African Americans and/or families with children. In response, Defendants contend that these are simply disgruntled former employees, many of whom claim to have never fulfilled the alleged instructions to discriminate. Defendants further assert that statistics demonstrate the falsity of these claims, showing diverse apartments free of discrimination of any kind.

## II.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(a), the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party moving for summary judgment may satisfy its burden under Rule 56 in either of two ways: (1) "submit affirmative evidence that negates an essential element of the nonmoving party's claim," or (2) "demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).

A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Id*. Likewise, the moving party's burden of production "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), *citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus*, 801 F.Supp. 1, 4 (S.D.Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

### III. ANALYSIS

A. **Motion Against the United States**

In their motion filed against the United States, Defendants raise multiple arguments in support of summary judgment.  First, Defendants contend that because there are no aggrieved persons, the United States lacks standing to pursue any claim.  Second, Defendants contend that the United States has no evidence of any pattern or practice of discrimination.  The Court now reviews those contentions.

The Court need not resolve Defendants' claim of a lack of standing.  This claim is premised upon a finding that there exist no aggrieved parties.  As will be discussed below, there is sufficient, conflicting evidence for numerous aggrieved parties to move forward to trial in this matter, thereby negating any claimed lack of standing.

With respect to whether the Government's pattern and practice claim is subject to summary judgment, the Court first details the elements of such a claim.  42 U.S.C. § 3614(a) provides:

> Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter, or that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance, the Attorney General may commence a civil action in any appropriate United States district court.

The United States Supreme Court has described the Government's burden in such a case as follows:

> As the plaintiff, the Government bore the initial burden of making out a prima facie case of discrimination. And, because it alleged a systemwide pattern or practice of resistance to the full enjoyment of Title VII rights, the Government ultimately had to prove more than the mere occurrence of isolated or "accidental" or sporadic discriminatory acts. It had to establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure the regular rather than the unusual practice.

*Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 (1977) (citations omitted).

That Court continued:

> The plaintiff in a pattern-or-practice action is the Government, and its initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers. At the initial, "liability" stage of a pattern-or-practice suit the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed. The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant. An employer might show, for example, that the claimed discriminatory pattern is a product of pre-Act hiring rather than unlawful post-Act discrimination, or that during the period it is alleged to have pursued a discriminatory policy it made too few employment decisions to justify the inference that it had engaged in a regular practice of discrimination.

*Id.* at 360 (citation omitted). Furthermore, "[t]he proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy." *Id.* at 362.

> Both *McDonnell Douglas* and *Teamsters* provide frameworks through which a plaintiff can prove intentional discrimination through circumstantial evidence. *See Birch v. Cuyahoga Cnty. Probate Ct.*, 392 F.3d 151, 165 (6th Cir. 2004) ("[T]he *McDonnell Douglas* ... paradigm [is] utilized for intentional discrimination cases premised solely on circumstantial evidence."); *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 183 (3rd Cir. 2009) ("The *Teamsters* framework was judicially promulgated as a *method of proof* for pattern-or-practice claims brought by the government under Title VII, as that statute authorizes—it provides a means by which courts can assess whether a particular form of statutorily prohibited discrimination exists, just as the *McDonnell Douglas* framework does for individual claims of disparate treatment." (emphasis added)); *Ekanem v. Heath & Hosp. Corp. of Marion Cnty., Ind.*, 724 F.2d 563, 575 (7th Cir. 1983) ("The 'pattern or practice' theory of proof set forth in Teamsters and its progeny affords plaintiffs wide latitude in attempting to establish circumstantial evidence of unlawful intent.").

*Serrano v. Cintas Corp.*, 699 F.3d 884, 892 (6th Cir. 2012).

Furthermore, the Sixth Circuit has noted as follows with respect to *Teamsters*:

The Teamsters framework is distinct. It charges the plaintiff with the higher initial burden of establishing "that unlawful discrimination has been a regular procedure or policy followed by an employer or a group of employers." *Teamsters*, 431 U.S. at 360, 97 S.Ct. 1843. Upon that showing, it is assumed "that any particular employment decision, during the period in which the discriminatory policy was in

6

> force, was made in pursuit of that policy" and, therefore, "[t]he [plaintiff] need only show that an alleged individual discriminatee unsuccessfully applied for a job." *Id*. at 362, 97 S.Ct. 1843. The burden then shifts to "the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons." *Id*. "When the Government seeks individual relief for the victims of the discriminatory practice," bifurcation of proceedings may be proper because "a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief." *Id*. at 361, 97 S.Ct. 1843.

*Id.* at 893.

In the instant matter, the Court has little trouble concluding that significant issues of fact remain for a jury to decide with respect to the pattern-or-practice claim. For example, the Government offers that ten of Mr. Ruth's former employees gave deposition testimony that they were instructed to discriminate against African Americans. The Government summarizes this testimony as follows:

| | |
|---|---|
| **Gregory Mays** (employed 2000-01) | Mr. Ruth instructed him **"we're getting too many black people,"** and that Mr. Mays **"was not allowed to show any apartments to African-American[s]."** Mays Dep. at 34:15-35:12; 111:15-19; 121:10-24. |
| **Dona Mitchell** (employed 2000-01) | Mr. Ruth instructed her that **the "ideal" tenant was "white"** and that his properties **"stayed nicer"** and are **"better off" when occupied by "the working white."** Mitchell Dep. at 44:2-15; 47:10-18. |
| **Joniece George** (employed 2000-01) | Mr. Ruth told her she was **"letting too many of those people in"** and **"to focus on white couples."** George Dep. at 42:6-23. |
| **Gene Schneff** (employed 2001-06) | Mr. Ruth instructed him to **"keep [African-Americans] down to a third."** G. Schneff Dep. at 43:15-44:23. He was told **"we got enough niggers, we don't need any more."** *Id*. at 42:12-43:7. |
| **Nancy Schneff** (employed 2004-06) | Mr. Ruth told her **not to rent to "Afro-Americans if they were boarder line"** and was told **"too many black people would ruin the** |

7

| | |
|---|---|
| | property and make it hard to rent." N. Schneff Dep. at 23:3-8; 138:2-12; 142:8-19. |
| **Tina Hoover** (employed 2006-07) | Mr. Ruth instructed her that **"he didn't want me putting a whole bunch of blacks in"** so that the property **"did not turn into a ghetto."** T. Hoover Dep. at 28:14-19; 32:12-24. |
| **John Morrison** (employed 2007) | Mr. Ruth instructed him **"he didn't want black people in there"** and **"how to get rid of them."** Morrison Dep. at 70:11-20; 75:5-9. He was told to **"slow down . . . letting the black people in"** because it was **"not good for business."** Id. at 88:12-23; 193:2-194:2. |
| **Christopher Hylton** (employed 2008) | Mr. Ruth instructed him **"I don't want you to rent to blacks,"** that he had **"problems in the past with niggers,"** that they were **"porch monkeys,"** and they **"downgrade[] the value of his property."** Hylton Dep. at 220:2-9; 93:17-94:13. |
| **Bo and Kendra Druckenbrod** (employed 2008) | Mr. Ruth told them **"I'm not a racist person, but I don't generally like to rent to black people. . . . they tend to be messy. They tend to cause problems. They tend to be trouble."** K. Druckenbrod Dep. at 124:24-125:13. See also N. Druckenbrod Dep. at 46:15-47:1. |

Doc. 121 at 34-35.

In their motion, Defendants attempt to undermine the above evidence through a variety of arguments. For example, Defendants contend that the above managers could not identify, by name, African American tenants who were non-renewed, outright denied a rental, or steered to other housing. While this assertion may certainly be utilized to undermine the weight of the testimony given by the former employees, it cannot **negate** the testimony. For example, Gene Schneff testified that fifteen to twenty African Americans were rejected and Schneff claims that Sharon McLean, one of Ruth's managing assistants, told him, "we got enough niggers, we don't need any more." Dona Mitchell testified that Mr. Ruth routinely instructed her to lie to African Americans about the availability of rentals. Christopher Hylton testified that he received nearly identical instructions when he began as an apartment manager. While these former managers could not identify by name the individuals they turned away, their testimony remains proper evidence of a pattern-or-practice of unlawful discrimination.

8

Similarly, the Government has introduced evidence from John Morrison and Gene Schneff that they were instructed to discriminate against families with children – specifically, that they were instructed to steer those families to first floor apartments or lie to them about the availability of upper level apartments.  Similarly, Bo and Kendra Druckenbrod asserted that they moved families with children to first floor units at the express instruction of Mr. Ruth.

Finally, the Government has presented evidence that numerous managers had their responsibilities reduced, were reprimanded, or terminated when they refused to follow Mr. Ruth's instructions to discriminate against African Americans and families with children.  Gregory Mays, Joniece Goerge, and John Morrison all claim to have lost authority when they refused to discriminate.  Further, George, Christopher Hylton, and the Druckenbrods assert that they were terminated shortly after they refused Mr. Ruth's instructions to discriminate.

In short, there is more-than-sufficient evidence in the record for the Government's pattern-or-practice claim to survive summary judgment.  In urging summary judgment, Defendants tend to ignore the evidence that exists and attempt to highlight the evidence that is lacking.  For example, they contend that no testers were ever utilized that could testify to being refused an available apartment or steered to a first floor apartment.  Again, while this may support an ultimate defense in this matter, it does not warrant summary judgment.  Similarly, attacking the credibility of the Government's witnesses is not proper at this stage of the proceedings.

> In another Fair Housing matter that went through a jury trial, the Eighth Circuit noted:
>
> In this case, the government has more than satisfied its burden of proof. Several of Dr. Dooley's apartment managers testified that Dr. Dooley personally instructed them not to rent to black applicants or—as Dr. Dooley referred to black applicants—"niggers." Some of the managers testified that, initially, they unwittingly rented to black applicants. When Dr. Dooley discovered his employees' actions, however, he angrily ordered them to tell black apartment

9

> seekers that no vacancies existed. Pursuant to Dr. Dooley's directives, the Big D employees repeatedly lied to black applicants who inquired about the availability of an apartment.

*United States v. Big D Enterprises, Inc.,* 184 F.3d 924, 930 (8th Cir. 1999).  In that regard, the Court cannot help but note the similarities between the evidence produced by the Government herein and the facts introduced to the jury in *Big D.*  For example, like the managers herein, the managers in *Big D* initially declined or unknowingly failed to follow their instructions to discriminate.  Those facts are precisely why Defendants herein cannot rely upon statistics in support of summary judgment.  Any statistics showing an integrated living complex are skewed by managers renting to African Americans and families *in spite of* instructions to discriminate.

In short, the Government has met its initial burden in its claims of a pattern-or-practice of discrimination.  Therefore, a jury must decide those claims.

As the resolution of those claims will necessarily impact whether inferences may be drawn in support of the alleged aggrieved parties, the Court is not inclined to review the substantive merits of the arguments Defendants have raised against each of these individuals.  Instead, if appropriate, the Court will revisit these issues following completion of a trial on the Government's pattern-or-practice claims.

However, the Court will address several non-substantive arguments raised by Defendants.  For example, Defendant Penson Properties moves for summary judgment on the basis that judgment cannot be achieved against a fictitious entity.  Penson's motion is GRANTED.  The Court is cognizant that Mr. Ruth utilized the name for many years before registering it with the State of Ohio.  However, as Mr. Ruth and all of his various LLCs are named Defendants herein,


further proceedings in the name of Penson Properties would be redundant of the proceedings against Mr. Ruth.[1]  Accordingly, Penson Properties is hereby dismissed from this litigation.

Defendants also seek to dismiss the claims of Mayle and Green, alleging that they are barred by the applicable statute of limitations.  In response, Mayle and Green assert that the continuing violations doctrine brings their claims within the applicable statute of limitations.  At this stage, the Court agrees.

The United States Supreme Court has described the continuing violations doctrine in the Fair Housing Act context as follows:

> We agree with the Court of Appeals that for purposes of § 812(a), a "continuing violation" of the Fair Housing Act should be treated differently from one discrete act of discrimination. Statutes of limitations such as that contained in § 812(a) are intended to keep stale claims out of the courts. Where the challenged violation is a continuing one, the staleness concern disappears. Petitioners' wooden application of § 812(a), which ignores the continuing nature of the alleged violation, only undermines the broad remedial intent of Congress embodied in the Act.. Like the Court of Appeals, we therefore conclude that where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice.

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 38-81 (1982) (citations and footnote omitted). In reviewing the claims of Mayle and Green, the Court is mindful that *Havens* is not a blanket rule of law that permits untimely claims any time a pattern-or-practice claim has been pled.  In fact, the claims of one tester that she did not receive truthful information were found to be time barred in *Havens* because the incident of steering that occurred during the limitations period could not be said to have caused the tester to not receive truthful information.  Herein, however, the broad pattern-or-practice of discrimination that has been alleged and demonstrated

---

[1] The Court has reached similar conclusions when, for example, a county sheriff is named in his official capacity and the county is also named.  The need for both to be named is non-existent.

sufficiently to survive summary warrants a conclusion that the continuing violations doctrine is applicable. Accordingly, the Court finds no merit in Defendants' argument that these claims are time barred.

Finally, Mary Ruth seeks summary judgment against Stark County, Nat Prather, Christopher Hylton, and Donald and January Fisher. Mrs. Ruth contends that none of the entities make any argument that she was personally involved in any discriminatory acts related to them. In response, these Plaintiffs assert that Mrs. Ruth should remain a defendant to their claims under a piercing the corporate veil theory. In support, Plaintiffs extensively argue that **Mr.** Ruth engaged in conduct that supports a piercing theory. In that regard, the Court would note that piercing the corporate veil is not a free-standing legal claim. *Pullman v. Alpha Media Pub., Inc.*, 2013 WL 1290409, at *30 (S.D.N.Y. Jan. 11, 2013). Instead, "[i]t is an equitable remedy that imposes liability for an underlying cause of action." *In re Conseco, Inc.*, 330 B.R. 673 (N.D.Ill. 2005). In so much as these Plaintiffs can produce no facts to support an underlying cause of action against Mrs. Ruth, they cannot maintain an action against her through exclusively a veil piercing argument. Accordingly, this limited motion for summary judgment by Mrs. Ruth is granted.

The Court would note that the grant of this relief does not remove veil piercing as a viable option as this matter progresses. Plaintiffs are free to pursue such an equitable remedy at the conclusion of this matter should they obtain judgment against the LLCs and believe that the facts support imposition of such a remedy.

Finally, as noted above, the Court will not review in detail the individual arguments raised in support of judgment against each of the individual plaintiffs and the aggrieved persons identified by the Government. However, the Court would note that there are substantial factual

disputes regarding many of these persons that defeat any attempt at summary judgment. For example, numerous persons raise claims that they were forced from their apartments based upon false noise complaints. In response, Defendants contend that the complaints were fully justified. As one example, Nat Prather explained his actions in detail on each of the days he received a noise complaint. Taking the evidence in a light most favorable to Prather, a jury could conclude that the noise complaints were "trumped up" or fabricated in support of Mr. Ruth's alleged discriminatory policies. Similarly, Megan Mayle claims that requests that she modify her lease to increase her rent based upon overnight guests were made solely because her guests were African American. While Defendants claim that this was a normal policy and procedure, a successful pattern-or-practice claim by the Government will cast an inference of discrimination over those actions.

In short, many of the claims of the aggrieved parties will rise and fall on the success of the Government's pattern-or-practice claims. As those claims must be submitted to a jury, as detailed above, it is premature to dismiss the claims of any of the aggrieved parties.

## V. CONCLUSION

Based upon the above, Penson Properties is hereby dismissed as a party. Moreover, the claims of Stark County, Nat Prather, Christopher Hylton, and Donald and January Fisher against Mary Ruth are dismissed. All other arguments for summary judgment are hereby rejected.

The Court is mindful that many courts have suggested that Fair Housing claims that involve underlying pattern-or-practice claims should be bifurcated with the liability phase being adjudicated before any individual relief is litigated. Within fourteen days of this order, the parties shall file position statements regarding whether the Court should bifurcate the proceedings in any manner. Furthermore, within twenty-one days the parties shall meet and

confer and jointly propose a final pretrial and trial date to the Court. The parties are advised to inform the Court of the expected length of any trial and the number of expected witnesses. In so doing, if the parties have not agreed on the issue of bifurcation, the joint proposal should include any and all alternatives. The parties are advised that the Court expects this matter to proceed to trial no later than **October 27, 2014.**

    IT IS SO ORDERED.


DATE: March 31, 2014        */s/ John R. Adams*_____
                                         Judge John R. Adams
                                         UNITED STATES DISTRICT COURT